UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

№ 13-CV-5587 (JFB)

GERMAINE MCCANTS,

Petitioner,

VERSUS

SUPERINTENDENT HALLENBACK,

Respondent.

**MEMORANDUM AND ORDER**
September 16, 2014

JOSEPH F. BIANCO, District Judge:

Germaine McCants ("McCants" or "petitioner") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his April 24, 2007 conviction in the Supreme Court of the State of New York, County of Nassau, on charges of criminal sale of a controlled substance in the third degree, N.Y. Penal Law § 220.39(a), criminal possession of a controlled substance in the third degree, *id.* § 220.16(1), criminal possession of a controlled substance in the fourth degree, *id.* § 220.09(1), and criminal possession of a controlled substance in the seventh degree, *id.* § 220.03.[1] Petitioner, a prior felony offender, was sentenced to concurrent terms of incarceration—the longest being twelve years—and three years of post-release supervision. In the instant petition, McCants challenges his conviction on the following grounds: (1) the conviction resulted from the prosecution's knowing use of perjured testimony by Detective Jayson Pinsky; and (2) the prosecution suppressed several material impeachment documents in violation of *Brady*. For the reasons set forth below, the Court determines that the petition for habeas corpus is without merit. Accordingly, the Court denies the petition in its entirety.

I. BACKGROUND

A. Facts

The following facts were adduced from the petition and documents attached thereto, and the state court trial and appellate record.

1. The Evidence at Trial

On March 8, 2006, Nassau County Police Department ("NCPD") officers arrested petitioner after witnessing him

---

[1] The jury acquitted petitioner of criminal use of drug paraphernalia in the second degree, N.Y. Penal Law § 220.05(2).

selling two bags of what appeared to be cocaine in a parking lot off Hempstead Avenue in West Hempstead, New York. (T. Tr.[2] 461, 468–69, 492–93, 706.) The officers found additional bags on the console of McCants's car. (T. Tr. 475.) In addition, a search incident to arrest revealed a small plastic bag containing eleven smaller bags, each with a white, rock-like substance, tied to the buttonhole of petitioner's boxer shorts. (T. Tr. 718, 720.) Petitioner also had $1,635 in his pants pocket. (T. Tr. 707–08, 715.) After being advised of and waiving his *Miranda* rights, petitioner provided a written statement to police, admitting to selling cocaine. (T. Tr. 1024, 1026.) Immediately after the sale, officers also arrested Leon McCoy ("McCoy"), who purchased the bags containing the substance from petitioner. (T. Tr. 468, 471.) Petitioner was charged under Nassau County Indictment No. 614N-06 and pleaded not guilty. Following a pre-trial suppression hearing, the trial court ruled that the police had probable cause to arrest petitioner and that the police acted lawfully when they recovered the plastic bags on the console of petitioner's car. (Resp. Br. at 2.) The court also ruled that the search of petitioner was proper, and that petitioner's oral and written statements, as well as the seized cocaine, were admissible at trial. (*Id.* at 2–3.) Petitioner does not challenge the correctness of those rulings.

At trial, the prosecution presented the testimony of four police officers who observed the drug transaction and/or were involved in the arrests of McCants and McCoy; the case detective who processed the evidence and to whom McCants made his written statement; McCoy; and NCPD Detective Jayson Pinsky ("Detective Pinsky"), who analyzed the substance retrieved by the police. McCants presented the testimony of Dolin Duffy, a real estate appraiser married to defense counsel. The instant petition primarily concerns Detective Pinsky's testimony.

As of the date of his testimony, September 25, 2006, Detective Pinsky had been assigned to the NCPD Forensic Evidence Bureau for nine years and was responsible for identifying controlled substances and marijuana. (T. Tr. 1142.) He has a Bachelor of Science in Chemistry and had received specialized training, including two-week training courses with the Federal Bureau of Investigation and the Drug Enforcement Administration, and a course with Hewlett Packard Corporation regarding the use and identification of substances using high performance liquid chromatography. (T. Tr. 1142–43.) Detective Pinsky had analyzed cocaine or crack cocaine "tens of thousands" of times and previously testified approximately twenty-five times. (T. Tr. 1143.) Over the objection of defense counsel, Detective Pinsky was admitted as "an expert in the testing and analysation [sic] of cocaine and crack-cocaine." (T. Tr. 1144.)

On or about March 14, 2006, Detective Pinsky received heat-sealed, clear plastic evidence bags containing eleven bags of substance (off-white, and chunky or powdery) from Detective-Sergeant Robert Nemeth. (T. Tr. 1145–46.) After confirming that the heat seals were intact and that the bags did not appear tampered with, Detective Pinsky opened the bags and attempted to ascertain the weight of the substances therein to determine how much would be necessary to make a particular charge, because different classifications of misdemeanors and felonies have a certain weight associated with them. (T. Tr. 1147, 1150.) Detective Pinsky first weighed all eleven bags and found that the total weight of the contents exceed one-eighth of an

---

[2] "T. Tr." refers to the transcript of petitioner's trial.

2

ounce, but was less than one-half of an ounce. This precluded any half-ounce charge, but ensured that he "just needed to get above an eighth of an ounce total aggregate weight" to bring the one-eighth ounce charge.[3] (*Id.*) Detective Pinsky then tested the substances in four randomly selected bags retrieved from petitioner; their weight came out to 4.073 grams total, which is equivalent to 0.143 ounces (while one-eighth of an ounce is 0.125 ounces). (*Id.*) Detective Pinsky then conducted a three-part analysis on the four bags, including: (1) a color test (to look for a specific family of substance) on all four bags; (2) a thin layer chromatography test (hereinafter "TLC") on all four bags; and (3) molecular confirmation testing using gas chromatograph mass spectrometry (hereinafter "GC/MS") on one bag. (T. Tr. 1148–49.) Those tests resulted in a finding of cocaine. (T. Tr. 1149–50.) He did not analyze the other three bags, and he did not know the chemical composition of the substances therein. (T. Tr. 1258–59.)

Detective Pinsky performed the color test by placing a portion of the questioned sample into a test tube and adding a reagent to it. (T. Tr. 1205.) A reagent is a liquid substance added to another substance that produces a chemical reaction, which itself produces a color change that would indicate (in this case) whether the questioned sample is consistent with cocaine. (T. Tr. 1205–06.) The color test indicated that the substance petitioner possessed was cocaine. (*Id.*) TLC is a comparative test in which the sample being tested is compared with a certified known sample of cocaine. (T. Tr. 1148.) Both samples are placed on a coated glass plate and in a solution of ethyl acetate, and are allowed to move up the plate for a period of time. (T. Tr. 1148–49.) The known and questioned sample are then sprayed with reagents and viewed to compare their color and positions on the plate. (*See* T. Tr. 1148–49, 1208–13, 1219.) The rate of movement depends upon the solubility of the substance, which in turn depends on the polarity of the compound.[4] (T. Tr. 1210.) In this case, Detective Pinsky verified that the known sample was cocaine, and he then compared it with the sample in evidence to determine that the substance McCants possessed was cocaine. (*See* T. Tr. 1176, 1178, 1222–23.) Finally, Detective Pinsky conducted a GC/MS test of one of the substances attributed to petitioner to determine the molecular composition of the questioned substance.[5] Detective Pinsky first testified as to the maintenance of the GC/MS unit used in this case (*see* T. Tr. 1181, 1216–18, 1245–47), and he then established the reliability of the GC/MS instrument by: (1) running the control sample to ensure the instrument was calibrated; (2) running a check sample (an internal sample of certified cocaine standard) through the instrument; (3) running the questioned substance through the instrument; and (4) running the control sample again. (*See* T. Tr. 1255.)

With respect to the two bags sold to McCoy, which weighed between five hundred milligrams and one-eighth of an ounce, Detective Pinsky testified that he performed the same three-part analysis. (T. Tr. 1159–60.) He also performed additional

---

[3] One-eighth of an ounce is the weight requirement for criminal possession of a controlled substance in the fourth degree. N.Y. Penal Law § 220.09(1).

[4] Detective Pinsky testified that a comparison was necessary to show that the cocaine would wind up on the plate in the same spot and have the same color, and he stated that no other substance could trigger the same test results. (T. Tr. 1221–22.)

[5] "Gas chromatography is a widely used scientific method of quantitatively analyzing the constituents of a mixture." *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2711 n.1 (2011).

testing because "if a substance falls between 500 milligrams and an eighth of an ounce, under the law, we have to determine pure substance." (T. Tr. 1160.) Thus, because he found that the bags contained a certain amount of cocaine, he then used high performance liquid chromatography testing, with and without ultraviolet, to determine the pure substance of the item in question. (*Id.*) Detective Pinsky determined the starting weight to be 1.97 grams, and that converting it to pure substance equaled 1,168 milligrams of pure cocaine. (*Id.*)

### 2. Direct Appeals

Assisted by counsel, petitioner appealed his conviction to the New York Supreme Court, Appellate Division, Second Department. The court affirmed the conviction on November 10, 2009. *People v. McCants*, 888 N.Y.S.2d 200 (N.Y. App. Div. 2009). Counsel then applied for leave to appeal to the New York Court of Appeals on December 4, 2009. The application was denied on January 15, 2010. *People v. McCants*, 13 N.Y.3d 940 (2010). Counsel sought reconsideration on May 11, 2010, which the Court of Appeals denied on August 16, 2010. *People v. McCants*, 15 N.Y.3d 807 (2010). Petitioner did not seek direct review by the U.S. Supreme Court.

### 3. Collateral Attacks in State Court

#### a. First § 440.10 Motion

On March 3, 2011, petitioner moved the New York Supreme Court to vacate his judgment of conviction pursuant to N.Y. Crim. Proc. Law § 440.10 on three grounds.

First, petitioner argued that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose six allegedly material impeachment documents: (1) a September 28, 2005 inspection report by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board ("ASCLD/LAB") (the "2005 Inspection Report"); (2) a January 5, 2006 letter from the New York State Commission on Forensic Science (the "CFS") to NCPD expressing concerns over the findings of the 2005 Inspection Report (the "CFS Letter"); (3) a February 6, 2006 remediation plan in response to the September 2005 inspection; (4) a March 31, 2006 remediation plan in response to the September 2005 inspection; (5) a July 24, 2006 ASCLD/LAB report (the "2006 ASCLD Report"); and (6) an August 14, 2006 ASCLD/LAB letter advising that the Forensic Evidence Bureau was on probation (the "August 14 Letter"). *People v. McCants*, 938 N.Y.S.2d 229, 2011 WL 4055602, at *2 (N.Y. Sup. Ct. Sept. 13, 2011). Second, petitioner argued that Detective Pinsky committed perjury when he (a) misrepresented that he was an expert, because he was trained by and worked in a lab found to have deficiencies;[6] (b) testified that the substance he tested was in fact cocaine (because he did not perform the GC/MS test on each substance); and (c) submitted three fraudulent documents regarding the calibration of the GC/MS instrument used to test the cocaine and the certification of the control sample used in the TLC testing—none of which were introduced into evidence by the prosecution.[7] Finally, petitioner argued that a November 24, 2010 ASCLD/LAB

---

[6] Petitioner based this on the 2005 Inspection Report, which found, *inter alia*, that the lab was non-compliant for failing to perform "proficiency testing with blind and re-examination techniques," and for lacking a "system for monitoring . . . court testimony." (Pet. Br. at 6.)

[7] The documents were a GC/MS quick-tune report printout, a certification of a control sample of cocaine, and a document regarding the certification of the control sample. *McCants*, 2011 WL 4055602, at *6 n.2.

4

Inspection Report (the "2010 Inspection Report") finding the Forensic Evidence Bureau noncompliant and placing it on probation constituted "newly discovered evidence" that would probably change the result of the trial. The People opposed, arguing, *inter alia*, that the documents were not *Brady* material, because they were not favorable or material to McCants's guilt or innocence and did not affect Detective Pinsky's credibility, and that the documents were not known to or possessed by the prosecution at the time of trial.

The state court denied the motion on September 13, 2011. The court concluded that (1) assuming *arguendo* the documents regarding the lab are impeaching, there was no reasonable probability that they would have changed the outcome of the trial, because the problems addressed by the 2005 Inspection Report and remediation letters were solved by the time Detective Pinsky tested the substances from McCants, and nothing indicated that Detective Pinsky's methods were implicated by the documents; (2) any issues at the Forensic Evidence Bureau would not have prevented the court from concluding that Detective Pinsky was an expert witness; (3) there was no good faith basis to claim Detective Pinsky committed perjury when he testified that the substance he tested for was cocaine; (4) the claim regarding the allegedly fraudulent documents was meritless, because petitioner either explored the issues on cross-examination or did not raise them at trial; (5) McCants's claims regarding the 2010 Inspection Report were unsubstantiated and were otherwise undermined by independent tests that confirmed the propriety of Detective Pinsky's findings, and the Report would have had no effect on a re-trial. *See generally McCants*, 2011 WL 4055602.

On October 5, 2011, petitioner filed an application with the Appellate Division for leave to appeal the denial. This application was denied on July 24, 2012. (July 24, 2012 Decision and Order, Resp. Ex. 14).

b. Second § 440.10 Motion

On December 22, 2011, petitioner filed a subsequent motion pursuant to § 440.10, arguing that newly obtained documents would change the court's previous holding. (Pet. Br. at 10). Those documents were: (1) a November 2011 report of New York State Inspector General, Ellen Biben, titled "Investigation into the Nassau County Police Department Forensic Evidence Bureau" (the "November 2011 Report"); (2) emails from Melanie McMillan from January through May 2006 to ASCLD/LAB staff, with accompanying FEBN Command Procedures; and (3) certain Nassau County Police Command Procedures. (Resp. Br. at xi). On May 9, 2012, the Supreme Court denied the motion, construing it as a motion to reargue. (May 9, 2011 Order, Pet. Ex. A2.) The court also stated that "proof of Defendant's guilt remains overwhelming." (*Id.*) The Appellate Division denied leave to appeal on June 17, 2013. (June 17, 2013 Decision and Order, Resp. Ex. 20).

4. The Instant Petition

Petitioner, with assistance from an advisory counsel, filed his *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on October 1, 2013. Respondent opposed on February 11, 2014. Petitioner replied on March 12, 2014. The Court has fully considered the submissions and arguments of the parties.

II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

### III. DISCUSSION

McCants raises the following grounds for habeas relief in his petition: (1) the conviction resulted from the prosecution's knowing use of perjured testimony by Detective Pinsky; and (2) the prosecution suppressed several material impeachment documents. Petitioner also asserts that *de novo* review is appropriate with respect to the issues raised in the second § 440.10 motion. Respondent does not contest that these arguments have been sufficiently preserved for habeas review, but argues that the claims are meritless. For the following reasons, this Court concludes that petitioner's claims are patently without merit and denies the petition in its entirety.

6

### A. Perjury

Petitioner argues that habeas relief is appropriate because the state court erroneously concluded that Detective Pinsky did not give perjured testimony. According to petitioner, the newly obtained documents raised in his § 440.10 motions, and the trial record, prove that Detective Pinsky perjured himself when he testified that he "made a 'quantitative determination' that each of the six packets of substance underlying the charges contained 'cocaine.'" (Pet. Br. at 6.) Petitioner claims Detective Pinsky did not follow the proper Forensic Evidence Bureau Command Procedures, which petitioner did not know about until the release of the 2010 Inspection Report. (Pet. Br. at 7.) He also asserts that the evidence presented in his first motion "constitutes clear and convincing evidence to rebut the presumption of correctness cited in the state court decision." (Pet. Br. at 8.)

#### 1. Legal Standard

A petitioner's claim that his or her conviction was based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The threshold question is whether the witness in fact committed perjury. *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001). "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *Id.* (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993)).

Once that threshold determination has been met, "[w]hether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991). "Where the prosecution knew or should have known of the perjury, the conviction must be set aside 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Id.* (quoting *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir. 1982)). When there is no indication the government knew the testimony may have been perjured, "a new trial is warranted only if the testimony was material and the court is left with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted." *Id* (internal citation and quotation marks omitted).

#### 2. Application

According to petitioner, Detective Pinsky committed perjury when he testified to making a "quantitative determination" of the molecular chemical composition of the six bags of substance (four from petitioner and two from McCoy), because he allegedly did not follow the confirmation testing requirements set forth in Command Procedures 1.01 and 1.18. Petitioner states that he learned of these procedures when the Nassau County District Attorney's Office provided the prosecution with the November 24, 2010 ASCLD/LAB report, which in turn brought about information that indicated the lab was also placed on probation in 2006, and then taken off probation in 2007. (Pet. Br. at 7–8). According to petitioner, Detective Pinsky violated protocols when he only performed confirmation testing on two of the six substances, and did not do a comparison analysis with known drug standards for the two remaining substances. (*Id.* at 8–9). Petitioner also argues that the documents introduced with his second post-judgment motion (which the state court characterized as a motion for

reconsideration)[8] confirm the perjury, because the November 2011 Report found that the lab reports sent to prosecutors did not accurately document the testing methods that had been used, and other documents contradicted claims that the protocols in 2006 did not require molecular confirmation testing of each substance.[9] (*Id.* at 10–11.) Respondent counters that this evidence does not establish that Detective Pinsky committed perjury because: (1) his testimony and reports establish exactly how much of the substances he tested, and defense counsel cross-examined Detective Pinsky at length; (2) the CFS letter was written three months before petitioner was arrested and relates solely to ASCLD/LAB findings in September 2005; (3) the documents indicate that all essential criteria were brought into compliance since the September 2005 inspection, and nothing indicates that Detective Pinsky violated any protocols during his testing.

The record before the Court establishes that the state court correctly determined that Detective Pinsky did not commit perjury, because he did not "give[] false testimony concerning a material matter with the willful intent to provide false testimony," or even "provide incorrect testimony resulting from confusion, mistake, or faulty memory," *Dunnigan*, 507 U.S. at 94. Thus, petitioner cannot establish the threshold requirement.

Specifically, Detective Pinsky testified that he utilized the color and TLS tests on four of the bags seized from petitioner and both bags seized from McCoy, and the GC/MS test on one bag from petitioner and both bags from McCoy.[10] He also admitted that he did not test all eleven bags or conduct a GC/MS test on every bag he analyzed. The test reports do not imply otherwise. Further, the fact that Detective Pinsky performed additional tests on the bags from McCoy establishes his awareness of the necessary procedures depending on the various weight cut-offs for different criminal charges. In all, the steps Detective Pinsky took were presented to the jury, and defense counsel conducted a thorough cross-examination. Detective Pinsky never testified regarding the FEBN Command Procedures or other practices at the Forensic Evidence Bureau.[11] In short, petitioner has pointed to nothing in the record that remotely implies that Detective Pinsky's testimony regarding his credentials and the

---

[8] Petitioner argues that *de novo* review is warranted on the issues raised in the second § 440.10 motion because the state court erroneously characterized the motion as a motion to reargue and thus never considered the merits of petitioner's arguments. (Pet. Br. at 11.) The Court disagrees. As detailed *infra*, the documents submitted were cumulative or otherwise summarized previously presented facts. Regardless, even under *de novo* review, for the reasons set forth *infra*, the Court concludes that petitioner has not established that Detective Pinsky committed perjury or that these documents constitute *Brady* material.

[9] In support of his petition, McCants submitted the following documents: (1) NCPD Command Procedures 1.01 and 1.18; (2) two lab reports completed by Detective Pinsky in connection with the testing of McCants's drugs; (3) excerpts from defense counsel's opening statement, Detective Pinsky's trial testimony, and the defense and prosecution summations; (4) a letter from the NYS Commission on Forensic Science to NCPD dated January 5, 2006; (5) a letter from ASCLD/LAB to NCPD dated August 6, 2006; and (6) a four page excerpt from the November 2011 Report.

[10] Although petitioner does not press his argument that Detective Pinsky should not been qualified as an expert at trial, the Court nevertheless concludes that this qualification was appropriate given Detective Pinsky's experience analyzing controlled substances, education, and specialized training. The Court has no basis to conclude that his qualification as an expert was based on an erroneous application of federal law or an unreasonable determination of the facts in light of the evidence.

[11] The Court fully discusses the documents *infra*.

testing of the substances was false. Petitioner's challenge to the *propriety* and *thoroughness* of Detective Pinsky's methods cannot establish perjury.

The documentary evidence also does not support petitioner's claim for relief. FEBN Command Procedure 1.01, "Analyzing and Reporting Controlled Substances," specifies that all qualitative determinations of controlled substances be made by molecular confirmation. Detective Pinsky's method complied with Procedure 6, which provides that "if multiple exhibits are submitted in one case, the chemist, to reduce analysis time, may randomly select and analyze a sufficient number of exhibits in order to satisfy the requirements to obtain the highest charge as described by New York State Penal Law."[12] (FEBN Command Procedure 1.01, Pet. Ex. B1.) FEBN Command Procedure 1.18, "General Confirmation Procedure Using GC/MS," provides that spectral comparisons should be made utilizing known standards or reference materials, and it sets forth several suggested references. (FEBN Command Procedure 1.18, Pet. Ex. B2.) Petitioner makes much of the fact that Detective Pinsky did not perform a GC/MS test on all of the bags in evidence, but the record indicates that Detective Pinsky conducted his testing in conformance with these procedures. It was unnecessary to test all four bags using the GC/MS method, because N.Y. Penal Law § 220.09(1) only requires that the defendant "knowingly and unlawfully" possess "one or more preparations, compounds, mixtures or substances containing a narcotic drug and said preparations, compounds, mixtures or substances are of an aggregate weight of one-eighth ounce or more." Thus, the statute did not require Detective Pinsky to find that petitioner possessed one-eighth of an ounce of pure cocaine, or determine that each bag separately contained the necessary weight to sustain the charge.[13] In addition, the CFS letter pre-dated McCants's arrest and relates solely to the September 2005 Report—before the tests at issue. (CFS Letter, Pet. Ex. B6.) The August 14 Letter from ASCLD/LAB states that a July 2006 inspection found that "all essential criteria have been brought into compliance [since the September 2006 inspection] or the service for which compliance was not achieved has been permanently or temporarily discontinued." (August 14 Letter, Pet. Ex. B7.) Although that letter indicates the lab was on probation, it did not mention ongoing noncompliance. Moreover, none of these documents reference petitioner or Detective Pinsky. The November 2011 Report also does not support McCants's claims. The excerpts he relies upon detail problems with the Forensic Evidence Bureau, but most pre-dated the tests at issue, and the report does not discuss Detective Pinsky, his methods, or the falsification of lab findings. (*See* November 2011 Report Excerpts, Pet. Ex. B8.) Therefore, these documents do not support, or even suggest, that Detective Pinsky committed perjury.

In sum, the Court concludes that there is no evidence in the record to support a claim

---

[12] The 2007 FEBN Command Procedure 1.01 provides: "When multiple submissions are submitted for controlled substances analysis, a minimum of 10% of each submission type must be analyzed with at least one molecular confirmation of that identified controlled substance." (2007 FEBN 1.01 Command Procedure, Pet. Ex. B1.) Detective Pinsky clearly complied with this requirement.

[13] The total weight of the cocaine sold to McCoy was irrelevant to the charges against petitioner. He was charged with criminal sale of a controlled substance in the third degree and criminal possession of a controlled substance in the seventh degree with regard to those drugs, and neither of those charges requires a specific weight. *See* N.Y. Penal Law §§ 220.16(1), 220.03.

that Detective Pinsky committed perjury during petitioner's trial. Therefore, there is no basis for habeas relief on this ground.[14]

B. <u>Failure of Prosecution to Disclose Evidence Favorable to Petitioner</u>

Petitioner also argues that habeas relief is warranted because the prosecution suppressed numerous allegedly material impeachment documents, and the state court's adjudication of this issue was contrary to clearly established federal law regarding materiality evaluations. As set forth below, the Court disagrees.

1. Legal Standard

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In order to prevail on a *Brady* claim, a petitioner must demonstrate that material evidence favorable to his case was not disclosed to him. *Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("[T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."). "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Failure to disclose such material merits relief only if the prosecution's failure "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678). Thus, the three elements of a *Brady* violation are that: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Strickler*, 527 U.S. at 281–82.

2. Application

In his first § 440.10 motion, petitioner asserted that the 2005 Inspection Report and related documents were undisclosed *Brady* material. His second motion relied on the November 2011 Report, certain emails, and NCPD Command Procedures. McCants argues that (1) the state court erroneously analyzed the materiality of the documents submitted with his first § 440.10 motion; and (2) the state court conducted a "sufficiency of remaining evidence test" instead of analyzing whether the evidence could change the outcome of the trial. (Pet. Br. at 13.) Petitioner claims this was contrary to the Supreme Court's holdings in *Kyles* and *Bagley*. He also argues that the state court should have considered the documents submitted with his second motion. The Court finds that petitioner's contentions are belied by the record, which indicates that the state court analyzed the documents at issue both individually and collectively, and also considered whether, taken together, there was a reasonable probability that their introduction would have changed the outcome of the trial. The

---

[14] Even if the prosecution knew or should have known of any perjury, there is no "'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Wallach*, 935 F.2d at 456. Although Detective Pinsky's testimony supports the fact that petitioner sold cocaine, the prosecution also presented the testimony of officers who witnessed the drug transaction at issue, and petitioner admitted that he sold cocaine. Thus, as the Second Department concluded, "the evidence of the defendant's guilt is overwhelming." *McCants*, 888 N.Y.S.2d at 203. Petitioner does not attempt to address the balance of the prosecution's case.

Court also concludes that the documents submitted with the second § 440.10 motion were not *Brady* material.[15]

The state court rejected petitioner's claims, concluding that the documents were not impeaching, and, assuming *arguendo* that they were, there was no reasonable probability their admission would have changed the outcome of the trial. *McCants*, 2011 WL 4055602, at *2–4. According to the court, the 2005 Inspection Report indicated the lab was non-complaint in four essential criteria related to controlled substances: written technical manuals were unavailable for personnel review, TLC standards were not dated, color reagents were not routinely checked and were used beyond lab-set expiration dates, and scales were not externally calibrated consistent with the lab's operating procedures. The remediation letters in 2006 detailed the lab's efforts to become compliant before the tests in petitioner's case, and an ASCLD/LAB inspection in July 2006 found the lab fully compliant with all essential criteria. Nevertheless, the ASCLD Board advised the lab on August 14, 2006, that it had voted to place the lab's accreditation on probation due to the previous findings of non-compliance. The court, therefore, concluded that, because any compliance issues were corrected at the time of the test, none of the documents were exculpatory or, taken together, impeaching. *Id.* at *2. The court also reasoned that, even if the documents were impeaching, there was no reasonable probability that they would have changed the outcome of the trial because: (1) "[t]aken together [the documents] are a story of problems found and *solved* by the relevant time, that being the time of the test in defendant's case"; and (2) there was no evidence that the documents pertained to Detective Pinsky or the tests at issue. *Id.* at *4 (emphasis in original). Next, the court concluded that the People had submitted exhibits putting the documents "in a context making it clear that they are not exculpatory or impeaching and that they would not change the outcome of the case" because: (1) after the Nassau County District Attorney discovered the issues with the Forensic Evidence Bureau, it ordered retesting by an independent lab, which independently corroborated Detective Pinsky's findings and his methodology; (2) the Director of the Department of Forensic Genetics at the Nassau County Medical Examiner's Office, Dr. Pasquale Buffolino, who worked on the remediation plan in 2010 and 2011 and was an ASCLD/LAB inspector, concluded that Detective Pinsky followed the correct procedures, and found that the issues in 2005 had no negative impact on the accuracy of petitioner's test results; (3) any other issues identified in the 2005 Inspection Report were remedied by the time of Detective Pinsky's tests; (4) Detective Pinsky did not conclude that the substance was cocaine based on the color test, and, if the reagent had failed to react properly, it would have produced a false negative instead of a false positive; and (5) Detective Pinsky did not use either of the two flawed scales. *Id.* at *4–5. Finally, the

---

[15] It also is unclear whether the prosecution even knew about the alleged impeachment documents at the time of trial. The New York Inspector General, in fact, stated that the Nassau County District Attorney did not have knowledge of problems at the lab. (*See* November 2011 Report, at 154–55 ("[U]p until [December 2010], District Attorney Rice and her office took for granted the accuracy and reliability of the evidence produced by the FEB. . . . Nevertheless, upon learning of the FEB's probationary status, District Attorney Rice acted responsibly in calling for the retesting of thousands of cases to ensure the reliability of convictions obtained or sought by her office.").) Thus, there may be no basis to impute knowledge of these issues to the prosecution simply because they relied on Detective Pinsky's testimony. In any event, this fact is immaterial to the analysis.

court looked to the other evidence and gave weight to McCants's admission that he sold cocaine and the Appellate Division's finding that the evidence of guilt was overwhelming. *Id.* at *5.

Petitioner claims the state court's analysis was "patently erroneous." (Pet. Br. at 15.) This Court, however, having independently reviewed the documents at issue, finds no basis to conclude that the state court erroneously determined that this evidence was not "favorable" to the defense. *See Rojas v. Woods*, No. 07-Civ-6687 (DAB), 2009 WL 4639620, at *2 (S.D.N.Y. Dec. 3, 2009) (acknowledging that a "'true *Brady* violation'" requires a showing, in part that the evidence at issue is "'favorable to the accused, either because it is exculpatory, or because it is impeaching'" (quoting *Strickler*, 527 U.S. at 281–82)). In itself, this is a sufficient ground to deny petitioner habeas relief. Moreover, even assuming *arguendo* that the evidence was impeaching, petitioner has not shown that it was material to the finding of guilt. *See Kyles*, 514 U.S. at 433–34 (stating that evidence is "material" for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (citation and internal quotation marks omitted)). Contrary to petitioner's claim, the state court did not consider the documents on an "item by item basis" instead of collectively in the context of the evidentiary record. Instead, the court detailed the contents of each document and whether they could be material or impeaching, and then considered whether, "[t]aken together," there was a "reasonable probability that they would have changed the outcome of the trial." *McCants*, 2011 WL 4055602, at *4. This properly articulates the Supreme Court's test. Moreover, in light of the minimal probative value of the documents, and the other evidence presented by the prosecution, it cannot be said that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 434. In sum, the state court did not unreasonably apply clearly established federal law in analyzing the documents submitted with the first § 440.10 motion, nor did it unreasonably determine the facts in light of the evidence.

The allegedly new facts presented in the second § 440.10 motion also do not establish a basis for habeas relief. As detailed *supra*, the November 2011 Report (which clearly was unavailable to the People during trial) detailed the issues at the Forensic Evidence Bureau from 2005 and 2006, all of which were remedied (and which petitioner addressed in his first motion). The report did not mention petitioner's case or Detective Pinsky. Thus, the excerpts were not favorable to petitioner or material to his case. (*See* November 2011 Report Excerpts, Pet. Ex. B8.) The five emails in 2006 from Melanie McMillan, the Forensic Evidence Bureau's Quality Assurance Manager, contain questions posed by McMillan to ASCLD regarding the clarification of certain terms, ASCLD's official procedure for retiring a particular discipline, guidance on developing and documenting in the lab's quality manual a system for the validation of test procedures, and post-it notes that were left behind by the inspection team. (*See* McMillan Emails, Resp. Ex. 15.) In addition, McMillan's April 2006 email acknowledges the remediation of certain non-compliance issues. (*Id.*) None of the emails mentions Detective Pinsky, petitioner, or issues with the testing of controlled substances. Finally, the record indicates that Detective Pinsky complied with the relevant Command Procedures, and, in any event, the Command Procedures are not of such a character as to create a reasonable probability that the result of the

proceeding would have been different if they had been introduced at trial. Thus, as a threshold matter, the documents submitted by petitioner are not *Brady* material.

Therefore, the Court concludes that the state court correctly held that none of the documents submitted by petitioner were material or impeaching under *Brady*, and it properly analyzed the documents' cumulative impact and their effect on the outcome of the case in accordance with the principles in *Kyles* and *Bagley*. Accordingly, habeas relief is not appropriate on this ground, as the state court's determination was neither contrary to nor an unreasonable application of, federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.

### IV. CONCLUSION

For the foregoing reasons, the Court concludes that petitioner has demonstrated no basis for habeas relief under 28 U.S.C § 2254. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 16, 2014
      Central Islip, NY

\*   \*   \*

Petitioner proceeds *pro se*. Respondent is represented by Kathleen Rice, Nassau County District Attorney, by Tammy J. Smiely, Robert A. Schwartz, and Barbara Kornblau, Assistant District Attorneys, 262 Old Country Road, Mineola, NY 11501.